ALICE WILLIAMS *et al.*, Plaintiffs-Appellants, v. UNIVERSITY OF CHICAGO HOSPITALS *et al.*, Defendants-Appellees.

First District (6th Division)   Nos. 1—94—2658, 1—94—2697 cons.

Opinion filed May 3, 1996.—Modified on denial of rehearing July 5, 1996.

Arnold Bernstein, of Northbrook, and William John Gerard, Jr., of Chicago, for appellants.

William V. Johnson and Charles W. Planek, of Johnson & Bell, Ltd., of Chicago (Thomas H. Fegan and Mindy Kallus, of counsel), for appellees.

JUSTICE EGAN delivered the opinion of the court:

We granted this interlocutory appeal pursuant to Supreme Court Rule 308(a) (134 Ill. 2d R. 308(a)) to determine the extent of damages a plaintiff may recover in a negligence action when a failed tubal ligation results in a birth of a child with a genetic or congenital disorder.

According to the allegations of the complaint, which for the purposes of this appeal we must take as true, the facts are as follows.

The plaintiffs, Alice Williams (Alice) and Jerry Williams, are husband and wife. In 1984 Alice sought a tubal ligation because she had experienced complications during her previous pregnancies, including a possible ectopic pregnancy in March 1979; a stillborn birth in June 1982; as well as the premature birth of a son in February 1984, who was later diagnosed as hyperactive and learning-disabled. Alice later married Jerry Williams. Jerry Williams is not the father of the child born in 1984. The defendant Dr. Lane Mercer performed the tubal ligation procedure on July 20, 1984. Between July 20, 1984, and May 1991, Alice returned for treatment on numerous occasions and the defendants failed to inform her that the tubal

ligation had been improperly performed and was not complete or effective.

In May 1991, Alice discovered she was pregnant. In October 1991, she gave birth to a son, Emmanuel, who has been diagnosed with Attention Deficit Hyperactivity Disorder, a genetic or congenital disorder.

The plaintiffs claim that the defendants' negligent performance and monitoring of Alice's tubal ligation will require them to incur in behalf of Emmanuel "extraordinary medical care *** for many months and years subsequent to delivery including to the age of majority, for many months and years beyond the age of majority based on the profound mental and physical impairment of said child." Discovery has revealed that the "extraordinary medical care" required by Emmanuel consists primarily of psychological treatment and special education.

The defendants filed motions *in limine* seeking (1) to exclude evidence of the extraordinary medical care needed by Emmanuel; and (2) to exclude expert testimony as to the cost of educating Emmanuel which would be borne by the plaintiffs. The expert's opinion was that the public school system would not be able to provide adequate counseling and education for Emmanuel.

The trial judge denied the defendants' first motion; he held that because the costs the plaintiffs sought were extraordinary costs of child-rearing, they are recoverable damages under the supreme court's decision in *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 230, 512 N.E.2d 691 (1987). The judge granted the defendants' second motion; he held that because the Illinois Constitution requires the State to pay for the costs of a child's education, there was no basis for expert testimony regarding the State's inability to do so. The trial judge certified the issues raised by both motions, stating the questions for our review as follows:

"(1) Do the parents of a child born following a failed tubal ligation have a cause of action for special damages against the treating physicians and hospital for the extraordinary psychological and/or educational expenses which may be incurred in raising their child, where the complaint alleges that Mrs. Williams' medical history included a hyperactive son by another father, but there are no allegations or proof that the Defendants proximately caused Emmanuel Williams' Attention Deficit Hyperactivity Disorder?

(2) Where plaintiff[s'] expert testifies that the public school will more likely than not fail to provide the appropriate special education, special therapy or mental treatment, should the plaintiff[s]

be allowed to present evidence, as part of their damages, showing the future extraordinary educational expenses of the abnormal child in a wrongful pregnancy action?"

No Illinois case provides a clear answer to either question. Recent years have witnessed a growing body of case law throughout the United States addressing a variety of issues arising from allegations that medical negligence resulted in the births of either unwanted healthy children or wanted or unwanted children suffering from various genetic and congenital defects and ailments. See Note, *Damages: Recovery of Damages in Actions for Wrongful Birth, Wrongful Life and Wrongful Conception*, 23 Washburn L.J. 309 (1984) (citing cases). The Illinois Supreme Court has addressed the issues in two exhaustive opinions, *Cockrum v. Baumgartner*, 95 Ill. 2d 193, 447 N.E.2d 385 (1983), and *Siemieniec v. Lutheran General Hospital.* Both cases discuss the divergence of thought on the issues that exists in courts of review throughout the nation. The opinions themselves illustrate that divergence. Two justices dissented in *Cockrum.* In *Siemieniec,* one justice concurred specially in part; two justices concurred specially in part and dissented in part; they did not concur in or dissent from the same parts of the majority opinion.

*Cockrum* involved two causes of action. One was brought by a couple who alleged that the defendant doctor had negligently performed a vasectomy on the plaintiff and as a result a normal child was born. In the second case, the complaint alleged that the defendant doctor had negligently performed a tubal cauterization designed to render the plaintiff sterile. After the plaintiff experienced symptoms of pregnancy, she was advised by medical personnel at the clinic operated by another defendant that she was not pregnant. After the time in which it was medically safe to have an abortion, she learned she was, in fact, pregnant. She later delivered a normal child.

In both cases the plaintiffs sought to recover as damages the future expenses of rearing the child. The trial judge dismissed the complaints, and the appellate court reversed. The supreme court reversed the appellate court and held that the parents could recover for the expenses of the unsuccessful operation, the pain and suffering involved, any medical complications caused by the pregnancy, the costs of delivery, lost wages and loss of consortium; but the court held the plaintiffs could not recover the future expenses of rearing the child.

Four years later the supreme court decided *Siemieniec.* In *Siemieniec,* the plaintiff became pregnant. Her family history revealed that two of her deceased cousins had been afflicted with hemophilia. Dur-

ing the first trimester of her pregnancy, she sought genetic counseling at the defendant hospital to determine the likelihood that her already conceived child could inherit hemophilia. She informed the defendant doctor of her desire to terminate the pregnancy by abortion if there was a substantial risk of her bearing a hemophilic child. That doctor advised the plaintiff of the availability of prenatal genetic diagnostic tests to determine a risk of her child being afflicted with hemophilia. He referred her to another doctor who later advised the plaintiff that the risk of her being a carrier of classic hemophilia was "very low." Based upon that information she exercised a conscious choice to proceed with the pregnancy. A child was subsequently born who was diagnosed as a hemophiliac.

The plaintiff and her husband on their own behalf and on behalf of their child filed a complaint alleging that the defendants had failed to accurately advise her of the risk of the child being born a hemophiliac and as a result the child was not aborted. The complaint sought damages for the extraordinary medical expenses the plaintiff would incur in caring for and treating the child's hemophilic condition during his minority and for the extraordinary expenses the child would incur for the treatment of his impaired physical condition after he reached majority and for the alleged emotional distress and mental anguish sustained by the plaintiff and her husband attendant to the raising and caring of a hemophiliac.

■ The supreme court distinguished between the various causes of action arising from births allegedly caused by medical malpractice:

(1) " 'Wrongful birth' refers to the claim for relief of parents who allege they would have avoided conception or terminated the pregnancy by abortion but for the negligence" of medical personnel in "prenatal testing, genetic prognosticating, or counseling parents as to the likelihood of giving birth to a physically or mentally impaired child." *Siemieniec*, 117 Ill. 2d at 235.

(2) An action for "wrongful life" is brought by or on behalf of an infant who suffers from a genetic or congenital disorder. The child claims that the medical personnel failed to accurately perform genetic screening prior to conception or to correctly inform the prospective parents of the hereditary nature of certain genetic disorders or failed to accurately advise the parents during pregnancy concerning genetic risks or failed to perform a surgical procedure intended to prevent the birth of a congenitally or genetically defective child. "The essence of the child's claim is that the medical professional's breach of the applicable standard of care precluded an informed parental decision to avoid his conception or birth." *Siemieniec*, 117 Ill. 2d at 236.

The court distinguished actions for wrongful birth and wrongful life from actions which the court labeled "wrongful conception or pregnancy." Liability of a physician in such a case is based on the physician's negligence in performing either a sterilization procedure or an abortion. The court described the cause of action in *Cockrum* as a "wrongful pregnancy" action. *Siemieniec*, 117 Ill. 2d at 256. The court did not overrule *Cockrum*.

The *Siemieniec* court concluded that no cause of action could be maintained by the child for wrongful life, but that the parents could maintain an action for wrongful birth of a genetically or congenitally defective child and could recover as damages "the extraordinary expenses—medical, hospital, institutional, educational and otherwise—which are necessary to properly manage and treat the congenital or genetic disorder." *Siemieniec*, 117 Ill. 2d at 260.

It is clear to us that the complaint before us is not a claim for "wrongful birth," as that term is defined in *Siemieniec*. The plaintiffs agree and state that this is a claim for wrongful pregnancy. The defendants maintain that under *Cockrum*, the plaintiffs' claim must fall. We recognize that this case differs from *Cockrum* in that the child in *Cockrum* was a normal child. The issue, therefore, is whether *Cockrum* applies where the child born is not a healthy, normal child. No Illinois case is in point, but several cases from other jurisdictions are. See *Simmons v. Hertzman*, 99 Ohio App. 3d 453, 651 N.E.2d 13 (1994); *Williams v. Van Biber*, 886 S.W.2d 10 (Mo. App. 1994); *Garrison v. Foy*, 486 N.E.2d 5 (Ind. App. 1985); *LaPoint v. Shirley*, 409 F. Supp. 118 (W.D. Tex. 1976). No case of wrongful pregnancy is cited which recognizes a distinction between pregnancies which result in the birth of a healthy child and pregnancies which result in an abnormal child.

At oral argument we granted the defendant's motion to cite *Fassoulas v. Ramey*, 450 So. 2d 822 (Fla. 1984). We are uncertain whether that case involved an action for "wrongful birth" or one of "wrongful conception." The majority described it as a cause of action for "wrongful birth." 450 So. 2d at 822. The dissent described it as an action of "wrongful conception" with this observation:

> "The instant case is technically and properly a 'wrongful conception' action, and not a 'wrongful birth' or 'wrongful life' action. [Citation.]
>
> 'The distinction between a wrongful life action and a wrongful birth action is that the former is brought by the child, whereas the latter is brought by the parents. Wrongful conception cases are primarily distinguishable from both wrongful life and wrongful birth cases in that the parents in the latter cases want a healthy child, *whereas in wrongful*

*conception cases the parents do not want a child at all.' "*
(Emphasis added.) 450 So. 2d at 825 n.1, quoting Note, *Wrong-ful Conception: Who Pays for Bringing Up Baby*, 47 Fordham L. Rev. 418, 418 n.7 (1978) (Ehrlich, J., dissenting).

We will discuss the *Fassoulas* case in more detail later.

All the cases we have cited from other jurisdictions denied liability for extraordinary damages for claims brought under a wrongful pregnancy theory because of the birth of an abnormal or unhealthy child. In *Simmons v. Hertzman*, the Ohio Court of Appeals addressed the issue directly:

"We should decline to draw a distinction between cases for a 'healthy' child and an 'abnormal' child ***. The difference between a 'healthy' child and an 'abnormal' child may often be a matter of degree, a fact which discourages the creation of a special rule for 'abnormal' children. Every person has some 'abnormality.' " *Simmons*, 99 Ohio App. 3d at 458, 651 N.E.2d at 17.

■ All cases hold that, absent any allegation that the defendant caused the birth defect, the birth of an abnormal child is not reasonably foreseeable as the result of a failed sterilization. Contrary to the argument of the plaintiffs, this is so even when the parents, as in this case, allegedly inform the doctor performing the sterilization both that the mother has had a history of difficult pregnancies and is aware that future pregnancies might have a high risk for the child. *Williams*, 886 S.W.2d at 14.

We believe that the reasoning of those cases denying liability based on a lack of causation is sound. That liability should be subject to the general principle of tort law recognized in Illinois that proximate cause exists "when the injury is the natural and probable result of the defendant's negligent act, and the injury is of the sort that an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence." *Quirke v. City of Harvey*, 266 Ill. App. 3d 664, 668, 639 N.E.2d 1355 (1994).

We hold as a matter of law that the injury in this case is not the natural and probable result of the defendants' negligent acts and the injury is not of the sort that an ordinarily prudent person ought to have foreseen as likely to occur as a result of their negligence.

We see no reason to depart from recognition of general principles of tort law because the physician had been made aware of the plaintiffs' history. *Williams*, 886 S.W.2d at 14. Implicit in the plaintiffs' argument is the assumption that a physician informed of a history of the birth of an abnormal child would be more careful in performing a tubal ligation than another physician performing a

tubal ligation who was informed that the woman opted for the procedure for economic reasons or because of the simple fact that she did not want children. The law recognizes only one standard of care for all physicians, and the law expects every physician who performs a tubal ligation to do each of them to the best of his ability.

The case on which the plaintiffs primarily rely, *Pitre v. Opelousas General Hospital*, 530 So. 2d 1151 (La. 1988), does not support their position and, in fact, supports that of the defendants. In *Pitre*, the court held that extraordinary expenses of the type claimed in this case are not sufficiently foreseeable as the result of a failed sterilization to hold the professional liable. *Pitre*, 530 So. 2d at 1162. The court, however, remanded the case to the trial court to give the plaintiffs an opportunity to amend their pleadings to allege facts which would establish foreseeability. The plaintiffs in the case before us have not suggested what additional facts they can plead to establish foreseeability. They rely on the fact that the defendants were aware of Alice's history.

The plaintiffs also cite *Doerr v. Villate*, 74 Ill. App. 2d 332, 220 N.E.2d 767 (1966), in which the plaintiff sued a doctor alleging that as a result of a failed procedure to sterilize her husband a retarded and deformed child was born. The case was dismissed on the basis of the statute of limitations. The plaintiff claimed that her action was for property damage, and the defendants claimed that it was for personal injury. *Doerr*, 74 Ill. App. 2d at 335. The appellate court agreed with the plaintiff. The court stated, without discussion, that the complaint stated a cause of action. We do not consider *Doerr* a persuasive precedent.

As noted, the plaintiffs also cited *Fassoulas v. Ramey*. In that case, the plaintiffs were parents of two children who suffered from severe congenital abnormalities. They decided not to have any more children, and the husband underwent a vasectomy. Due to the negligence of the doctor defendant who performed the vasectomy, the wife became pregnant and gave birth to a child that had many congenital deformities. The same doctor that had performed the vasectomy gave erroneous advice to the plaintiffs concerning residual pockets of sperm. Relying on that advice, the plaintiffs resumed sexual relations in the belief that there could be no further pregnancy. The wife again became pregnant and delivered a son with slight physical deformity which was corrected at birth. He was then a normal, healthy child.

The plaintiff sued for damages which included the expenses for the care and upbringing of both children. In a four to three decision, the Florida Supreme Court held that the plaintiff could not recover

the ordinary, everyday expenses associated with the care and upbringing of either child, but that the plaintiffs could recover "special medical and educational expenses, beyond normal rearing costs" for the upbringing of the deformed child. *Fassoulas*, 450 So. 2d at 824. The dissenting minority held that the plaintiffs should have been entitled to all of the damages prayed for, including those for the care and upbringing of the normal child. The minority view that the plaintiff was entitled to damages for the birth of a normal child is contrary to the holding of our supreme court in *Cockrum*.

The majority opinion made no mention of foreseeability. Interestingly, the minority opinion rested its conclusion on what it described as "traditional tort principles." 450 So. 2d at 826 (Ehrlich, J., dissenting). The minority also stated that the birth of the unhealthy child was "clearly a foreseeable consequence of [the defendant's] negligence." 450 So. 2d at 829 (Ehrlich, J., dissenting). We do not agree with the views of either the majority or the minority in *Fassoulas* with regard to special damages for the birth of an unhealthy child. In our judgment, they are contrary to the better reasoned opinions from other jurisdictions that we have cited.

In their petition for rehearing, the plaintiffs insist that we have misapprehended *Cockrum v. Baumgartner*. The plaintiffs point out that the *Cockrum* court did not decide that the birth of a healthy child from a failed tubal ligation was not foreseeable. We recognize that the *Cockrum* court rested its holding on another ground and did not address the question of causation, and we have already acknowledged that no Illinois case provides a clear answer to the question before us.

Let us assume solely for the sake of argument that the pregnancy itself is, as the law requires, the "natural and probable result of the defendant's negligent act." *Quirke*, 266 Ill. App. 3d at 668. The law also requires that the court find that "the injury is of the sort that an ordinarily prudent person ought to have foreseen as *likely* to occur as a result of the negligence." (Emphasis added.) *Quirke*, 266 Ill. App. 3d at 668. We are not prepared to say that the ultimate "injury," that is, the unhealthy child, was one that an ordinarily prudent person ought to have foreseen as *likely* to occur as a result of negligence.

In sum, we agree with the language of the Supreme Court of Wyoming in *Beardsley v. Wierdsma*, 650 P.2d 288, 292 (Wyo. 1982):

> "We reject any claim for damages or expenses after the birth of the child. We believe that these latter expenses and damages are too speculative; that the injury is too remote from the negligence; that the injury is out of proportion to the culpability of the tortfeasors; and that the allowance of recovery would place too unrea-

sonable a burden on [the defendants], since it would likely open the way for fraudulent claims, and since it would enter a field that has no sensible or just stopping point."

We wish to make it clear that we reach our decision on the basis of the law of causation and not on the argument of the defendants, accepted by some courts, that liability should be excused in the cases of wrongful pregnancy because the woman had the ability to terminate the pregnancy. We agree with the plaintiffs' argument that this is an improper justification for denying liability. There are, we are certain, many women who would undergo procedures to prevent pregnancy but who would not be willing to undergo any procedure which would terminate it. See *Cockrum*, 95 Ill. 2d at 207 (Clark, J., dissenting).

For these reasons, we answer the first question certified in the negative. The order *in limine* that the plaintiffs would be entitled to prove special damages for the education, treatment or rearing of their child is vacated. In view of our answer to the first question, we deem it unnecessary to answer the second question.

Order vacated and cause remanded.

McNAMARA and RAKOWSKI, JJ., concur.